# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT OF BRUCE OAKLEY, INC. and JOHNSTON'S PORT 33, INC., OWNERS OF THE M/V LEGACY, FOR EXONERATION FROM OR LIMITATION OF LIABILITY, | ) ) ) ) ) ) | Case No. CIV-19-184-RAW-JAR |
| IN THE MATTER OF SOUTHERN TOWING COMPANY, LLC, IN A CAUSE OF EXONERATION FROM OR LIMITATION OF LIABILITY, | ) ) ) ) | Case No. CIV-19-396-RAW-JAR |
| IN THE MATTER OF THE COMPLAINT OF MARQUETTE TRANSPORTATION COMPANY, LLC AND LMR FREIGHT, LLC AS OWNERS *PRO HAC VICE* OF THE MTC-7256 AND THE LTD-11140, FOR EXONERATION FROM OR LIMITATION OF LIABILITY, | ) ) ) ) ) ) ) | Case No. CIV-19-400-RAW-JAR |

## FINDINGS AND RECOMMENDATION

This matter comes before this Court on the following motions:

1) Third-Party Defendant Jantran, Inc.'s Motion for Summary Judgment (Docket Entry No. 152);

2) Marquette Transportation Company, LLC and LMR Freight, LLC's Motion for Summary Judgment (Docket Entry No. 153);

3) Southern Towing Company, LLC's Motion to Strike Late Disclosed Expert (Docket Entry No. 154);

4) Consolidated Grain and Barge Co. and CGB Enterprises, Inc's Motion for Summary Judgment Against Bruce Oakley, Inc. and

1

Johnston's Port 33 (Docket Entry No. 156);

5) Petitioners-in-Limitation and Claimants Bruce Oakley, Inc.'s and Johnston's Port 33, Inc.'s Motion for Partial Summary Judgment (Docket Entry No. 159); and

6) Southern Towing Company, LLC's Motion for Summary Judgment (Docket Entry No. 160).

On October 18, 2023, this Court conducted a hearing and received oral argument on the subject motions. All parties were represented at the hearing.

### Summary of Events

In May of 2019, the Arkansas River basin experienced extreme rainfall and attendant flooding. On May 22, 2019, the Fort Gibson Reservoir on the river filled to capacity which resulted in the United States Army Corps of Engineers to open the flood gates in order to prevent the dam on the Reservoir from failing. The water was released into the Grand River, where a towing vessel operated by Southern Towing Company, LLC identified as the M/V DENNIS COLLINS was towing two tank barges and was moored alongside two loaded barges owned by Marquette Transportation Company, LLC. The opening of the dam and resulting massive influx of water then caused the moorings securing this flotilla to the shore to part. Unable to control all four loaded barges in the swift currents, the M/V DENNIS COLLINS released the Marquette barges which were

2

recaptured by another vessel, the LEGACY.  The LEGACY captured the Marquette barges in the Arkansas River and tied them off to trees.  The Arkansas River experienced rapidly rising water just downstream from where the Marquette barges originally broke free.  The Marquette barges once again broke free from the tie-off.  The barges then floated downriver, eventually striking the Webber Falls Dam and sinking, causing significant damage to the lock and dam.  The barges were a total loss.

### The Parties

1.    Marquette Transportation Company, LLC and LMR Freight, LLC (collectively referred to as "Marquette") provided the barges (MTC-7256 and LTD-11140) to Bruce Oakley, Inc.

2.    Bruce Oakley, Inc. and/or Johnston's Port 33, Inc. (collectively referred to as "Oakley") operated a fleet of transport vehicles and received the MTC-7256 and LTD-11140 barges into their fleet in Muskogee, Oklahoma.  Oakley owned and operated the towing vessel M/V LEGACY.

3.    Southern Towing Company, LLC ("STC") was the owner and operator of the M/V DENNIS COLLINS.

4.    Jantran, Inc. ("Jantran") was a transport company responsible for delivering the MTC-7256 and LTD-11140 barges to Oakley for Marquette.

5.    United States of America ("United States") owned and operated

3

the Webbers Falls Lock and Dam.

6.    Consolidated Grain & Barge Co. and CGB Enterprises, Inc. (collectively referred to as "CGB") owned the fertilizer cargo on board the MTC-7256 and LTD-11140 barges.

### Findings of Fact

1.    Marquette chartered the MTC-7256 from East West Bank by written agreement dated September 29, 2017.  Under that agreement, Marquette assumed the risk of loss and any damage to MTC-7256.[1]

2.    Marquette undertook the responsibility for the operation of certain vessels, including the LTD-11140, for the owner, Mizuho American Leasing, LLC, by agreement dated October 1, 2025.  Under that agreement, Marquette assumed the risk of loss and any damage to LTD-11140.[2]

3.    In early 2019, Marquette arranged for Jantran to transport the MTC-7256 to Oakley's Inola fleet, located at or about Mile 433 on the Arkansas River.[3]  On March 27, 2019, Jantran transported MTC-7256 into Oakley's Muskogee fleet, located at or about Mile 393 of the Arkansas River, by the M/V MISS ALEX, a Jantran-operated vessel.[4]  Oakley's Muskogee fleet is located at the confluence of

---

1 Declaration of Darin M. Adrian, Doc. Ent. No. 155, Exh. A.  The Court notes that an objection has been filed to the consideration of Mr. Adrian's statement. The objection will be addressed herein.
2 *Id.*
3 Declaration of Courtney Graves, Doc. Ent. No. 155, Exh. B.
4 *Id.*

the Arkansas River and the Grand River.[5]

4.    Marquette, through its Manager of Barge Logistics, had no knowledge of Jantran's placement of MTC-7256 in Oakley's Muskogee fleet instead of its Inola fleet.[6]

5.    In early 2019, Marquette also arranged for Jantran to transport the LTD-11140 to Oakley's Inola fleet.[7]  On April 4, 2019, LTD-11140 was delivered into Oakley's Muskogee fleet by the M/V BEVERELY ANNE, a Jantran-operated vessel.[8]

6.    The Jantran online system accessible to Marquette incorrectly showed that the Marquette Barges were located at Oakley's Inola fleet from the time they were dropped off by Jantran at the Muskogee fleet until after the barges broke away from the Muskogee fleet.[9]

7.    Once barges are dropped into Oakley's Muskogee fleet, it is Oakley's policy that they are in Oakley's care, custody, and control, and the fleet is responsible for the barges until they are picked up by a line boat.[10]

8.    It is Oakley's policy that from the time a barge is dropped off in Oakley's Muskogee fleet until it is picked up, the fleet is

---

5 Complaint, Case No. CIV-19-184-RAW, p.2.
6 Declaration of Courtney Graves, Doc. Ent. No. 155, Exh. B.
7 *Id.*
8 *Id.*
9 *Id.*
10 Depo. of Kenny Salcido, Doc. Ent. No. 155, Exh. C, pp. 34-35.

responsible for the mooring and monitoring of that barge.[11]  The Marquette Barges were moored in Oakley's Muskogee fleet by Oakley deckhands.[12]

9.    Sometime prior to the May 22, 2019 breakaway of the Marquette Barges, Fred Taylor, Port Director for Oakley ("Taylor"), discussed the fact that there was going to be record flooding at the Muskogee fleet with Oakley personnel, including Captain Kenny Salcido, the captain of the Oakley fleet boat in its Muskogee fleet ("Salcido"), the M/V LEGACY.[13]

10.  Taylor has worked for 37 years on the river.[14]  Taylor's responsibilities at Oakley included all operations at Oakley's Muskogee facility, including safety.[15]

11.  Salcido's job responsibilities included overseeing harbor works, operation of the boats, the fleets, and management thereof at the Oakley Muskogee facility.[16]

12.  Joshua Taylor, the manager of Oakley's Muskogee facility at the time of the May 22, 2019 breakaway, documented a forecast of "4" rain Satdy-Monday."[17]

13.   Joshua Taylor's job responsibilities included day-to-day

---

[11] *Id.* at p. 36.
[12] *Id.* at p. 207.
[13] *Id.* at p. 130-31, 177.
[14] Depo. of Fred Taylor, Doc. Ent. No. 155, Exh. E, p. 123.
[15] *Id.* at pp. 99-100.
[16] *Id.* at p. 100.
[17] Note of Joshua Taylor, Doc. Ent. No. 155, Exh. F.

operations for the Oakley terminal in Muskogee, including harbor and dock and rail for the facility, stevedoring operations, safety, environmental, and personnel management.[18]

14. On May 20, 2019, Taylor sent an email to various Oakley personnel, including Salcido and Joshua Taylor, which stated as follows:

> To all,
>
> We're expecting 3" to 4" of rainfall starting this afternoon thru tomorrow and some weather reports said we could see 5" to 7". Received 1.5" of rain over the weekend. With the reservoirs currently at 61% flood utilized . . . . We'll be securing our fleets, preparing sandbags for Muskogee and clearing some dock equipment @ Port 33.
>
> Fred[19]

15. Taylor testified the intent of the email was to prepare the facility for a high-water event.[20]

16. In the days leading up to the barge breakaway, Joshua Taylor reviewed the Army Corps of Engineers website to monitor conditions and was aware that the water flows on the Grand River would be increasing out of the Ft. Gibson Dam, which is positioned on the Grand River, upriver from the Oakley Muskogee fleet.[21]

---

18 Depo. of Fred Taylor, Doc. Ent. No. 155, Exh. E, p. 100.
19 Fred Taylor E-Mail, Doc. Ent. No. 155, Exh. G.
20 Depo. of Fred Taylor, Doc. Ent. No. 155, Exh. E, p. 89.
21 Depo. of Joshua Taylor, Doc. Ent. No. 155, Exh. H, p. 115-16.

17.  Oakley's Barge Handling in Fast Current and High Waters policy requires Oakley to "[p]ost a watchman on nights and weekends when river conditions warrant it."[22]

18.  No pilot or deckhand was sent out to check mooring lines on the weekend of May 18 and 19, 2019.[23]

19.  Oakley also has a policy to "skinny the fleet" in high water conditions, which Oakley defines as "make any three-wide moored vessels to two-wide, and two-wide moored vessels to one wide."[24]

20.  Oakley does not change the mooring configuration of its shore wires on its fleet in the Grand River when high water is expected.[25] Oakley does not have a policy of replacing shore wires in its fleet at set intervals; instead, they replace a wire only when they notice it is starting to fray.[26]  The determination of when to replace a fleet wire in the Oakley fleet is left to the discretion of the employee looking at the wire.[27]

21.  Joshua Taylor, the manager of the Oakley Muskogee location, personally participates in the inspection of shore wires in the fleet, but does not know how old the shore wires holding the Marquette Barges in place were; they could have been six months

---

22 Barge Handling in Fast Current & High Waters, Doc. Ent. No. 155, Exh. I.
23 Depo. of Kenny Salcido, Doc. Ent. No. 155, Exh. C, p. 51.
24 Oakley's Answer to Interrogatory No. 9, Doc. Ent. No. 155, Exh. J.
25 Depo. of Kenny Salcido, Doc. Ent. No. 155, Exh. C, p. 91-92.
26 *Id.* at 96.
27 Depo. of Joshua Taylor, Doc. Ent. No. 155, Exh. H, p. 134.

old, or five years old, he simply does not know.[28]

22.  Based on Oakley's invoices for the purchase of wire rope of the type used for its shore wires, the wires holding the Marquette Barges in place were more likely than not older than three (3) years.[29]

23.  On May 21, 2019, Salcido gave the Southern Towing vessel, the M/V DENNIS COLLINS, with two tank barges in tow, permission to move from shore wires located on the Arkansas River, near the mouth of the Grand River into Oakley's fleet on the Grand River, where the Marquette Barges were located, and moor against the barges.[30]

24.  At the time, many open positions were located within Oakley's fleet in the Grand River where the Southern Towing vessel could have moored directly to shore wires, without having to moor against the Marquette Barges.[31]

25.  Marquette, through its Manager of Barge Logistics, had no knowledge that Oakley allowed the M/V DENNIS COLLINS to moor against its barges until after the subject breakaway occurred.[32]

26.  Oakley's original plan was for the M/V DENNIS COLLINS to moor the barges in its tow to the Marquette Barges temporarily so that

---

28 *Id.* at 120-21.
29 Invoice, Doc. Ent. No. 155, Exh. K; Declaration of Robert D. Bartlett, Exh. L.
30 Depo. of Kurt Haas, Doc. Ent. No. 155, Exh. M, pp. 42, 45-53, 57-61.
31 Depo. of Joshua Taylor, Doc. Ent. No. 155, Exh. H, p. 168.
32 Declaration of Courtney Graves, Doc. Ent. No. 155, Exh. B.

the M/V DENNIS COLLINS could break out to go across the Grand River to pick up groceries and, upon returning, release from the two Marquette Barges and move the M/V DENNIS COLLINS and the barges in its tow to empty shore wires on the Grand River.[33]

27. The M/V DENNIS COLLINS stayed moored to the Marquette Barges when it returned because Salcido told the captain of the M/V DENNIS COLLINS, Captain Kurt Haas ("Haas"), he could stay moored to the Marquette Barges as long as he liked and did not have to move to an open set of shore wires.[34]

28. Taylor and Joshua Taylor were both aware prior to the breakaway that the M/V DENNIS COLLINS and the two barges in her tow were tied off on the side of the Marquette Barges, instead of available shore wires.[35]

29. While moored to the Marquette Barges, the M/V DENNIS COLLINS crew reconfigured the two shore wires holding the Marquette Barges in place and added a third shore wire to the barges.[36]

30. The Oakley fleet boat personnel did not board the Marquette Barges on May 21 or 22, 2019 to check on the barges or shore wires.[37]

---

33 Depo. of Kurt Haas, Doc. Ent. No. 155, Exh. M, pp. 160-62.
34 *Id.*
35 Depo. of Fred Taylor, Doc. Ent. No. 155, Exh. E, pp. 149-50; Depo. of Joshua Taylor, Doc. Ent. No. 155, Exh. H, p. 202.
36 Depo. of Kurt Haas, Doc. Ent. No. 155, Exh. M, pp. 57-65, 70-72.
37 Depo. of Lucas Wells, Doc. Ent. No. 155, Exh. O, pp. 84, 140-41.

31. On the morning of May 22, 2019, Salcido left the Oakley facility to return home to shower and change clothes.[38] Taylor and Joshua Taylor both gave Salcido permission to leave the facility to go home.[39]

32. At the time that Taylor and Joshua Taylor gave Salcido permission to leave the facility, he was the only licensed pilot available to operate the M/V LEGACY, and Joshua Taylor was aware of this fact when he gave Captain Salcido permission to leave.[40]

33. While Salcido was away from the Oakley facility, the shore wires holding the Marquette Barges in place broke and, after being separated from the M/V DENNIS COLLINS and her tow by the crew of the M/V DENNIS COLLINS, the Marquette Barges began traveling down the Grand River.[41]

34. The pilot on the M/V DENNIS COLLINS, Tory Riley ("Riley"), called Salcido on his cell phone immediately after the barges broke away, and Salcido, who was still away from the facility at the time, started traveling back to the Oakley facility.[42]

35. From the time that Riley called Salcido to report the

---

38
39 Depo. of Fred Taylor, Doc. Ent. No. 155, Exh. E, pp. 143-44; Depo. of Joshua Taylor, Exh. H, pp. 70-71.
40 Depo. of Fred Taylor, Doc. Ent. No. 155, Exh. E, pp. 143-44; Depo. of Joshua Taylor, Exh. H, pp. 42-43.
41 Report of Marine Casualty and Addendum, Doc. Ent. No. 155, Exh. P.
42 Depo. of Tory Riley, Doc. Ent. No. 155, Exh. Q, pp. 20-21; Depo. of Kenny Salcido, Doc. Ent. No. 155, Exh. C, pp. 132-34.

breakaway until the M/V LEGACY left the dock to try to catch the Marquette barges, minutes elapsed.[43]

36.  When Salcido arrived back at the facility, he boarded the M/V LEGACY and undertook to retrieve the Marquette Barges that had broken away from Oakley's fleet.[44]

37.  When Salcido returned to the M/V LEGACY, the two Marquette Barges were going past the Oakley dock.[45]  Taylor was on the M/V LEGACY.[46] Salcido on the M/V LEGACY caught up to the Marquette Barges on the Arkansas River and guided them to the shore.  Taylor and others tied the barges to trees on the bank.[47]

38.  Taylor has acknowledged that the United States Army Corps of Engineers has "a law, a rule, a regulation or a suggestion" that says "[y]ou can't tie off to trees."[48]

39.  Once the barges were tied to trees, Salcido and Taylor believed they were in a good position to watch the barges from the M/V LEGACY.[49]

40.  Discussions were had among Oakley management personnel, including Taylor, Joshua Taylor, Dennis Oakley, President of the company, about retrieving the Marquette Barges from the trees, but

---

43 Declaration of William J. Harding, Doc. Ent. No. 155, Exh. R.
44 Depo. of Kenny Salcido, Doc. Ent. No. 155, Exh. C, pp. 140-42.
45 *Id*. at 137.
46 *Id*. at 142-45.
47 *Id.*
48 *Id.* at 157-58.
49 Depo. of Fred Taylor, Doc. Ent. No. 155, Exh. E, pp. 43-44.

this did not take place.[50]

41.  In addition, the Oakley management personnel also chose not to have the M/V LEGACY return to the Marquette Barges and hold them in place against the rising current.[51]

42.  On the evening of May 22, 2019, the trees to which the Marquette Barges were tied uprooted in the high water conditions, and the barges traveled down the Arkansas River and ultimately allided with the Webbers Falls Lock and Dam on May 23, 2019 and sank.[52]

43.  The only barges that broke free from Oakley's Muskogee fleet during the high-water event in May of 2019 were the Marquette Barges, which Oakley allowed STC to moor against.[53]

44.  Inspection and testing of the three shore wires provided by Oakley for inspection after the breakaway has shown that they were in a worn and frayed condition, so much so that the three wires broke during subsequent strength testing at 18 percent, 29 percent, and 35 percent of their expected strength.[54]

45.  Haas, the captain of the M/V DENNIS COLLINS, has testified he observed no condition issues with the two Marquette Barges while

---

50 Depo. of Joshua Taylor, Doc. Ent. No. 155, Exh. H, p.148.
51 *Id*. at 82-83.
52 Report of Marine Casualty, Doc. Ent. No. 155, Exh. P.
53 Depo. of Kenny Salcido, Doc. Ent. No. 155, Exh. C, p. 184.
54 Declaration of Robert D. Bartlett, Doc. Ent. No. 155, Exh. L, Report attached as Exh. 1.

the M/V DENNIS COLLINS was moored against them.[55]

46.  Riley, the pilot on the M/V DENNIS COLLINS, also did not observe any issues with the conditions of the Marquette Barges while he was on the M/V DENNIS COLLINS.[56]

47.  Lucas Wells, a deckhand trainee on the M/V DENNIS COLLINS who testified he went onto the Marquette Barges multiple times on May 21 and 22, observed no issues with the conditions of the barges.[57]

48.  Brian Pinkston, a pilot on Jantran-operated vessel, the M/V BEVERLY ANNE, who was at the Muskogee facility at the time of the breakaway, also did not observe anything wrong with the fittings on the two Marquette Barges.[58]

49.  Taylor observed no issues with the fittings on the Marquette Barges and testified that their integrity looked good.[59]

50.  Oakley's retained liability experts do not opine that Marquette has any fault for the subject breakaway.[60]

51.  STC's retained liability experts do not opine that Marquette has any fault for the subject breakaway.[61]

52.  The Marquette Barges were total losses as a result of the

---

55 Depo. of Kurt Haas, Doc. Ent. No. 155, Exh. M, p. 134.
56 Depo. of Tory Riley, Doc. Ent. No. 155, Exh. Q, p. 42.
57 Depo. of Lucas Wells, Doc. Ent. No. 155, Exh. O, pp. 75-76.
58 Depo. of Brian Pinkston, Doc. Ent. No. 155, Exh. S, p. 102.
59 Depo. of Fred Taylor, Doc. Ent. No. 155, Exh. E, pp. 211-12.
60 Report of Scott Brown, Doc. Ent. No. 155, Exh. T; Report of John Leary, Doc. Ent. No. 155, Exh. U.
61 Reports and Rebuttal Reports of Samuel Schropp and Warren Spencer, Doc. Ent. No. 155, Exhs. V, W, X and Y.

subject incident.[62]

53.  The allision of the Marquette Barges with the Webbers Falls Lock and Dam resulted in damage to multiple flood gates, rendering them inoperable.  Water flowed uncontrolled through the dam which caused the water level to drop below the level necessary for hydropower generation.  Consequently, the hydropower plant only generated minor amounts of power and, by August 19, 2019, the Webbers Falls reservoir was completely drained and no water was available for hydropower generation.[63]

54.  On September 23, 2019, Oakley entered into a Memorandum of Agreement ("MOA") with the Department of the Army which provided, in pertinent part:

> Contributor [Oakley] may be determined to be a responsible party for damage to the Dam related to the barge strike and may have financial responsibility for repairs pursuant to Rivers and Harbors Act, 33 U.S.C. §§ 401-476.

The MOA also provided that Oakley "considers it in its own interest to contribute services – through a repair contractor – for emergency repairs to Dam . . . at its own discretion as a means of mitigating possible financial damages to the Government."[64]

---

62 Declaration of Darin M. Adrian, Doc. Ent. No. 155, Exh. A.
63 Webbers Falls Barge Crash Report – U.S. Dept. of Energy – Southwestern Power Administration, Doc. Ent. No. 160, Exh. 22.
64 MOA, Exh. B to Doc. Ent. No. 175 at p. 1.

55.  Three actions were initiated stemming from the allision of the Marquette barges:

(1)  <u>In the matter of Bruce Oakley, Inc. and Johnston's Port 33, Inc., owners of the M/V LEGACY for exoneration from or limitation of liability</u>, Case No. CIV-19-184-RAW-JAR in which the Petitioners seek a finding that

> (i) Petitioners, BRUCE OAKLEY, INC. and JOHNSTON'S PORT 33 INC. and the M/V LEGACY are not liable to any extent for any loss, damage, expense, or injury, nor for any claims whatsoever in any way arising out of or in any consequence of the aforesaid incident, and, therefore, Petitioners and the M/V LEGACY are entitled to a decree of exoneration in this matter; (ii) If Petitioners shall be adjudged liable to any extent in the premises, then such liability be limited to the value of Petitioners' interest in the M/V LEGACY following the incident, and that a decree may be entered discharging Petitioners and the M/V LEGACY from all further liability and further enjoining the filing and prosecution of any claim against Petitioners or their agents or employees, or the M/V LEGACY, with reference to the matter and happenings recited in this Complaint".

(2)  <u>In the matter of Southern Towing Company, LLC, in a cause of exoneration from or limitation of liability</u>, Case No. CIV-19-396-RAW-JAR in which the Petitioner seeks:

> (1) That the Court enter an order approving the aforementioned Ad Interim Stipulation of Value With a Letter of Undertaking deposited with the Court by Petitioner as security for

the amount or value of its interest in the M/V
DENNIS COLLINS.

(2) That the Court issue a notice to all
persons, firms, associations, or corporations
asserting claims with respect to which
Petitioner seeks exoneration from, or
limitation of liability, admonishing them to
file their respective claims with the Clerk of
this Court and to serve on the attorneys for
Petitioner a copy thereof on or before the
date to be named in the Notice and that if any
claimant desires to contest either the right
to exoneration from, or the right to
limitation of liability, that claimant shall
file and serve on the attorneys for Petitioner
an Answer to the Complaint on or before the
said date;

(3) That the Court enjoin the prosecution of
any and all actions, suits or proceedings
which may be commenced, of any nature or
description whatsoever in any jurisdiction
against Petitioner, the Vessel, or any other
property of Petitioner or against Petitioner's
employees or underwriters, except in this
action, to recover for damages from or with
respect to any bodily injury, death, damage to
property or other loss or destruction
resulting from the aforementioned incident, or
done, occasioned, occurred, or arising out of
said voyage or incidents;

4. That the Court adjudge that Petitioner is
not liable to any extent for the bodily
injury, death, or property damage, loss of use
or other loss or destruction resulting from
the aforementioned incident, or done,
occasioned, occurred, or arising out of said
voyage or incidents;

5. Alternatively, and only if Petitioner shall
be adjudged liable, then it prays that such
liability for any bodily injury, death,

17

damage, loss of use to property or other loss
or destruction and consequence of the said
voyage or incident be limited to the amount or
value of Petitioner's interest in the M/V
DENNIS COLLINS at the end of said voyage or
incident, plus pending freight, and that
Petitioner be discharged therefrom, upon
surrender of such interest and that the money
surrendered, paid or secured to be paid, be
divided pro rata according to the
aforementioned statutes and among the
claimants as they duly prove their claims in
accordance with the provisions of the Order
for which Petitioner has prayed herein, saving
to all parties any priorities to which they
may be legally entitled and that decree be
entered discharging Petitioner from all
further liability.

(3)    In the matter of Marquette Transportation Company, LLC and

LMR Freight, LLC as owners *pro hac vice* of the MTC-7256 and the

LTD-11140, for exoneration from or limitation of liability, Case

No. CIV-19-400-RAW-JAR in which Petitioners sought determinations:

(A) That this Court enter an Order approving
an ad interim stipulation this day filed by
Limitation Plaintiffs for the value of
Limitation Plaintiffs' interest in the MTC-
7256 and the LTD-11140 in the amount of $0.00
United States Dollars, with no pending
freight, and costs in the amount of $250.00
United States Dollars;

B. That this Court approve as security for the
value of the MTC-7256 and the LTD-11140, with
no pending freight, including the court costs,
the total amount of $250.00 United States
Dollars plus interest at the rate of six
percent (6%) per annum from the date of this
Complaint, with said amount to be deposited
into the registry of the Court;

18

C. That this Court issue an order enjoining or restraining the commencement or prosecution of any and all actions, suits or legal proceedings of whatsoever kind, nature or character by any claimant against the Limitation Plaintiffs, their respective officers, agents, servants, employees or affiliated companies, or against the MTC-7256 and the LTD-11140 itself, arising out of or attributable to the Incident;

D. That this Court admonish each and every claimant to appear and file his or her claim with the Clerk of this Court on or before a date to be fixed by this Court or be forever barred and permanently enjoined from making and filing such claims;

E. That this Court direct each and every claimant to answer the allegations contained in this Complaint;

F. That this Court, after due hearing, determine that Limitation Plaintiffs and/or the MTC-7256 and the LTD-11140 are not liable for any damage on any basis whatsoever in connection with the Incident and therefore are exonerated from all liability for the Incident; and

G. That, in the alternative, should this Court determine that Limitation Plaintiffs and/or the MTC-7256 and the LTD-11140 are liable to any person, firm, corporation or entity to any extent on any basis, which is denied, the Court then determine that Limitation Plaintiffs are entitled to limit their liability to the value of their interest in the MTC-7256 and the LTD-11140 and that a judgment be entered discharging Limitation Plaintiffs and the MTC-7256 and the LTD-11140 from any further liability arising from or growing out of or in connection with the

Incident, and for such other relief as the
proof may show appropriate.

Various claimants responded to these Complaints, asserting
negligence claims and other relief.  The cases were subsequently
consolidated under Case No. CIV-19-184-RAW-JAR.

## I.    Basis of Jurisdiction and Standard on Summary Judgment

Jurisdiction is appropriate in this case as this action was
initiated by the Petitioners under Fed. R. Civ. P. 9(h) and Rule
F of the Supplemental Rules for Certain Admiralty and Maritime
Claims of the Federal Rules of Civil Procedure.  Venue is
appropriate under Rule F(9) of the Supplemental Rules for Certain
Admiralty and Maritime Claims of the Federal Rules of Civil
Procedure as the vessels involved were located within this
District.

Under Rule 56(c) of the Federal Rules of Civil Procedure,
summary judgment is appropriate "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to judgment
as a matter of law."  Universal Money Centers v. A.T. & T., 22
F.3d 1527, 1529 (10th Cir.), *cert. denied*, 513 U.S. 1052, 115 S.Ct.
655, 130 L.Ed.2d 558 (1994).  The moving party bears the initial
burden of showing that there is an absence of any issues of

material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986).  A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed 2d 202 (1986).  In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).  Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial.  Applied Genetics v. Fist Affiliated Securities, 912 F.2d 1238, 1241 (10th Cir. 1990); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

## II. Law Governing a Limitation Action

In a limitation action, the Court "must determine what acts of negligence caused the accident.  Second, the court must determine whether the ship owner had knowledge or privity of those same acts of negligence."  In re Nagler, 246 F.Supp.3d 648, 656 (E.D. N.Y. 2017)(citations omitted).  A claimant "bears the initial burden of proving negligence after which the burden shifts to the ship owner to prove lack of knowledge or privity."  If the

Court determines that "there was no fault or negligence on the part of the shipowner, there is no liability to be limited, and the owner would be entitled to exoneration." Id. (citations omitted).

The elements of negligence "are essentially the same as land based negligence under the common law." Pearce v. U.S., 261 F.3d 643, 647 (6th Cir. 2001). In order to prevail in demonstrating negligence, a claimant must establish "1) the existence of a duty of care owed by the [Petitioner] to the [Claimant]; 2) the breach of that duty of care; 3) a causal connection between the offending conduct and the resulting injury, which is called 'proximate cause'; and 4) actual loss, injury or damage suffered by the [Claimant]." Id. (Bracketed information added by this Court).

### III. STC's Motion to Strike Darin Adrian

STC, and through an adoption response brief Oakley and Jantran, assert that Marquette's identification of Darin Adrian ("Adrian") as a non-retained expert witness was untimely and should be disallowed. Adrian was at all times relevant an Executive Vice President with Marquette. By virtue of a Declaration included

with Marquette's summary judgment motion, Adrian attests to the valuation of its barges as well as their procurement.[65]

Expert witnesses were to be disclosed by Petitioners by June 1, 2021 and for claimants by September 15, 2021.  It is undisputed that Marquette did not disclose Adrian until January 13, 2022 through a supplementation of its expert disclosures.  Marquette, however, had made its Rule 26 expert disclosures on August 17, 2021, disclosing that it would rely upon its corporate representative as a non-retained expert to testify regarding the valuation of its barges.[66]  Marquette admits that its disclosure was not timely under the schedule established in this case.  It states that its counsel offered Adrian for deposition and to acquiesce in the identification of rebuttal expert witnesses. These offers have not been accepted.

This case has been pending for almost six years and the identification of Adrian occurred almost four years ago.  During that time, no effort was apparently made to cure any prejudicial effect that the late disclosure may have served upon STC or the

---

65 Marquette's Motion for Summary Judgment, Doc. Ent. No. 155, Exh. A.
66 Doc. Ent. No. 118.

other parties.   Rule 37 of the Federal Rules of Civil Procedure

provides that

> A party that without substantial justification
> fails to disclose information required by Rule
> 26(a) or 26(e)(1), or to amend a prior
> response to discovery as required by Rule
> 26(e)(2), is not, unless such failure is
> harmless, permitted to use as evidence at a
> trial, at a hearing, or on a motion any witness
> or information not so disclosed.

Fed. R. Civ. P. 37(c)(1).

The Court has broad discretion to determine whether a Rule 26

violation is substantially justified or harmless. Woodworker's

Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993

(10th Cir. 1999).   The four factors identified by the Court in

Woodworker's for a court to consider in this evaluation are:

> (1) the prejudice or surprise to the party
> against whom the testimony is offered;
>
> (2) the ability of the party to cure the
> prejudice;
>
> (3) the extent to which introducing such
> testimony would disrupt the trial; and
>
> (4) the moving party's bad faith or
> willfulness.

Id. at 993.

As to the first factor, the only surprise was the identity of

Adrian as the corporate non-retained expert not the fact that such

an expert was going to be utilized by Marquette.   Curing the

prejudice could have occurred with a requested extension of the Daubert motion deadline and request to depose Adrian over the last four years. Because the testimony is largely valuation evidence for which STC and the others will have their own experts, a disruption of the trial is unlikely. Finally, based upon the evidence presented which is somewhat stale at this late date, this Court does not perceive bad faith or willfulness on the part of Marquette to hide the witness or intentional impose prejudice upon STC or the other parties. Still yet, since this case will entail a non-jury trial, the opportunity to depose Adrian remains. Based upon this lack of sustained and incurable prejudice, this Court will recommend that Adrian be permitted to remain as Marquette's non-retained expert for consideration on summary judgment and trial.

STC also seeks to strike the appraisal report of Merrill Marine Services, Inc. upon which Marquette relies to establish the value of the barges. STC asserts that the report does not reference both barges and was not properly disclosed under Fed. R. Civ. P. 26(a)(1)(A)(i). Since this Court finds that a dispute in the facts precludes summary judgment on the value of the barges, the issue of the reliability and timely disclosure of the appraisal report will be reserved for trial.

## IV.  **Summary Judgment Motion of Marquette**

In its summary judgment request, Marquette first asserts that it was not negligent in any form or fashion in its conduct concerning the barges which ultimately lead to the damage to the Webbers Falls Lock and Dam and the destruction of the barges and their cargo.  Nothing in the undisputed facts would indicate that Marquette was negligent.  It relinquished the care, custody, and control over the barges to Oakley, which apparently placed the barges in the wrong fleet which subjected the barges to the dangers which ultimately lead to their destruction.  Employees and agents of Oakley and STC then made the decisions as to the mooring under the conditions then present.  Oakley then became the immediate bailee to Marquette to protect the property entrusted to it – the barges.  "In maritime law as in common law, a bailee is responsible for exercising due care in the keeping of the good that has been entrusted to him." Rodi Yachts, Inc. v. Nat'l Marine, Inc., 984 F.2d 880, 885 (7th Cir. 1993) citing Riverway Co. v. Trumbull River Services, Inc., 674 F.2d 1146, 1150 (7th Cir. 1982); Solano v. Beilby, 761 F.2d 1369, 1373 (9th Cir. 1985); Global Tank Trailer Sales v. Textilana-Nease, Inc., 209 Kan. 314, 317, 496 P.2d 1292, 1295 (1972).  Oakley contends that STC subsequently became the bailee when Captain Salcido took possession and control of the

26

barges.   This Court finds a dispute in the facts precludes this finding at this time but it is clear a bailment relieved Marquette of any act of negligence on its part.

The evidence indicates that Oakley and STC were active participants in the events that transpired with Marquette's barges.   Marquette occupied no role in those events.   Oakley's attempt to confer some liability based upon Marquette's lack of knowledge of the whereabouts of its barges is without merit and specifically rejected.   Once Oakley became a bailee for the barges, Marquette was entitled to rely upon that relationship in the protection of its barges.

Oakley also relies upon the Rivers and Harbors Appropriation Act of 1899 (33 U.S.C. § 401, *et seq.*) and the Wreck Act (33 U.S.C. § 409) to confer strict liability upon Marquette.   Oakley's interpretation of the applicability of these acts to its claims is misplaced.   Neither Act has been found to provide for a private right of action.   *See* California v. Sierra Club, 451 U.S., 287, 297-98 (1980)("The language of the statute and its legislative history do not suggest that the Act was intended to create federal rights for the especial benefit of a class of persons but rather that it was intended to benefit the public at large through a general regulatory scheme to be administered by the then Secretary

27

of War.  Nor is there any evidence that Congress anticipated that
there would be a private remedy."); <u>Port of South Louisiana v.</u>
<u>Tri-Parish Indus. Inc.</u>, 927 F.Supp.2d 332, 337-38 (E.D. La.
2013)("the Federal Wreck Act, which is comprised of certain
provisions of the Rivers and Harbors Appropriation Act of 1899,
does not support a private right of action and therefore dismisses
Plaintiff's claim under Section 409.").  Both Acts make clear that
the cause of action for their enforcement lies with the United
States and not a private party.  As a result, Oakley cannot rely
upon these statutes to confer liability upon Marquette.

Having found no negligence or other liability upon Marquette,
this Court need not address the limitation of liability provisions.
Marquette next turns to the negligence liability of Oakley.  It
is on these issues that a dispute in the facts will preclude
summary judgment.  Among the disputed facts that preclude summary
judgment is whether Oakley's actions were the proximate cause of
the destruction of the barges, whether Captain Salcido's absence
from the M/V LEGACY constituted negligence, whether M/V LEGACY
should have stayed with the barges, and whether any intervening or
superseding act by M/V LEGACY and its crew affected liability of
either Oakley or STC, whether the actions of the M/V DENNIS COLLINS
constituted negligence, whether Oakley has met its considerable

28

burden to prove its Act of God defense, and the fair market value of the barges.[67]

## V.    Summary Judgment Motion of STC

STC asserts in its summary judgment motion that the water event giving rise to the destruction of the barges constituted an Act of God or *force majeure*.  The party asserting this defense bears the burden of demonstrating "that the accident could not have been prevented by 'human skill and precaution and a proper display of nautical skills[.]'"  Gulf Island Shipyards, LLC v. LaShip, LLC, 715 F. Supp. 3d 878, 890 (E.D. La. 2024), *reconsideration denied,* No. CV 22-154, 2024 WL 1794361 (E.D. La. Apr. 25, 2024) quoting James v. River Parishes Co., Inc., 686 F.2d 1129, 1133 (5th Cir. 1982).  "Vessels asserting the Act of God defense are held to a heavy burden, and courts require them to 'exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required.'"  Id. at 891 quoting Bunge Corp. v. M/V Furness Bridge, 558 F.2d 790, 795 (5th Cir. 1977).  The facts surrounding the human agency of STC's employees are disputed and the testimony

---

67 This Court recognizes that the United States did not respond to Marquette's summary judgment motion and Marquette does not challenge the United States' *in rem* claim through the motion.

29

must be evaluated for credibility and persuasiveness at trial. Summary judgment on this defense is inappropriate.

The same may also be said in the evaluation of STC's employees on the question of negligence. Disputes in the facts as to the relative actions and culpability of the parties precludes summary judgment on the issue of STC's alleged negligence.

STC also seeks to dismiss the United States' claim for the cost of lost hydroelectric power after the lock and dam was damaged by the barges. STC relies upon the doctrine espoused in Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303 (1927). The conclusion reached in Robins Dry Dock remains the current state of the law. Namely, that plaintiffs in maritime tort cases cannot recover economic losses absent physical injury to some proprietary interest. The United States relies on the case of Catalyst Old River Hydroelectric LP v. Ingram Barge Co., 639 F.3d 207 (5th Cir. 2011) to establish the basis for its claim in the face of Robins Dry Dock. In Catalyst, the Fifth Circuit recognized the Robins Dry Dock doctrine and the foundation for the doctrine "to limit the consequences of negligence and exclude indirect economic repercussions, which can be widespread and open-ended. In other words, . . . the Robins rule is a pragmatic restriction on foreseeability." Id. at 210 citing Louisiana ex rel. Guste v. M/V

TESTBANK, 752 F.2d 1019, 1022 (5th Cir. 1985) *cert. denied*, 477
U.S. 903 (1986).  The court ultimately permitted recovery by the
owner of a hydroelectric station against a tow operator that
negligently caused a barge to block intake channels that took in
water to power the station's generators, finding the intake channel
was a "functional component of Catalyst's hydroelectric generating
facility."  Id. at 211, 214.

While the hydroelectric plant is a separate facility from the
dam, it is apparent that, as in Catalyst, the dam represents a
functional component of the plant.  As reflected in the Department
of Energy's report, the allision of the barges with the dam
precluded the generation of electricity for a period of time,
demonstrating the essential nature of the dam to the hydroelectric
facility in carrying out its functions.[68]  Consequently, under
the authority of Catalyst, the United States may seek damages in
this case for the economic losses associated with the physical
damage sustained to the Webbers Falls Dam which caused the
reduction and loss of power generation capacity to the
hydroelectric facility.

---

68 Webbers Falls Barge Crash Report – U.S. Dept. of Energy – Southwestern Power
Administration, Doc. Ent. No. 160, Exh. 22.

As a final issue in its summary judgment request, STC contends that Oakley cannot recover the costs of voluntarily removing the barges from the Webbers Falls Lock and Dam under an MOA with the United States. STC asserts that Oakley was not under any obligation to remove the barges and should not be able to pursue claims against STC for recovery of the costs incurred in the removal of the barges.

STC cites to the Wreck Act which provides for the clearing of obstructions to navigable waters caused by a sunken vessel. 33 U.S.C. § 409. Section 409 imposes a duty upon the

> owner, lessee, or operator of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States . . . .

33 U.S.C. § 409.

In its response, Oakley does not dispute that it did not occupy the status as an "owner, lessee, or operator" of the barges. Rather, it contends that its MOA with the United States permits it to seek the recovery of the costs involved in the removal of the barges and damage repair of the lock and dam. Indeed, Oakley states without explanation that "[a] genuine issue of material fact exists as to whether, through these *Memoranda of Agreements*

32

with the United States, [Oakley] can recover its $3,956,249.11 wreck removal expenses under the Wreck Act."[69]  This Court finds no rational legal basis for Oakley to assert a claim against other allegedly negligent parties which arises from a contract with the United States.   Even under the MOA with the United States, Oakley expressly states that it "considers it in its own interest to contribute services – through a repair contractor – for emergency repairs to Dam . . . at its own discretion as a means of mitigating possible financial damages to the Government."[70]  This Court cannot perceive how a disputed fact exists which would preclude a determination that Oakley cannot recover its voluntarily provided repair services – the terms of the MOA is not in dispute, the other parties to this litigation were not parties to the MOA, and Oakley was under no legal obligation to provide the repair services.  It cannot indirectly seek recovery under the Wreck Act when it cannot do so directly through the vehicle of a contract with the United States.  Without more, this Court finds merit in STC's argument.

---

69 *See* Oakley's Response in Opposition to Southern Towing Company, LLC's Motion for Summary Judgment, Doc. Ent. No. 169, p. 25.
70 MOA, Exh. B to Doc. Ent. No. 175 at p. 2.

## VI. <u>Summary Judgment Motion of Jantran</u>

Jantran, which was responsible for the delivery of the MTC-7256 and LTD-11140 barges belonging to Marquette, also operated the M/V BEVERLY ANNE at the time of the events which lead to the barges' destruction. Admittedly, the barges were delivered to Oakley's Muskogee fleet rather than Oakley's Inola fleet which Marquette directed. Jantran now contends that no act of negligence can be attributed to it, warranting the dismissal of that claim against it. This Court agrees with Jantran's stated position that "[u]nder both common law and admiralty law, a private party has no affirmative duty to rescue or salvage a vessel in distress." <u>DFDS Seacruises (Bahamas) Ltd. v. United States</u>, 676 F.Supp. 1193, 1200 (S.D. Fla. 1987) citing <u>Basic Boats, Inc. v. United States</u>, 352 F.Supp. 44, 48 (E.D.Va. 1972); <u>Lacey v. United States</u>, 98 F.Supp. 219, 220 (D.Mass. 1951); W. Prosser, *Law of Torts* 41 (4th ed. 1971); *Restatement (Second) of Torts* § 281 (1965); <u>Frank v. United States</u>, 250 F.2d 178, 180 (3d Cir. 1957). Thus, Jantran through its vessel was under no obligation to attempt to chase down and secure the Marquette barges.

The allegations of Jantran's negligent conduct does not end with the conduct of the M/V BEVERLY ANNE. Rather, it is also alleged that Jantran delivered the barges to the wrong fleet than

agreed upon with Marquette.  STC is correct in its assessment that a "towing company's responsibility for its tow ceases upon the proper mooring of the tow at the final destination."  Ispat Inland, Inc. v. American Commercial Barge Line Co., 2002 WL 32098290, *15 (N.D. Ind. Sept. 30. 2002).  If the towing company finds that it cannot deliver the tow to the final destination, "it is her duty to return the tow to its owner or to tie it up at some safe place and protect it until she can deliver it at the point called for." The B.B. No. 21, 54 F.2d 532, 533 (2nd Cir. 1931).  A factual question remains as to the circumstances surrounding Jantran's delivery of the barges to a different fleet than was directed by Marquette.  Moreover, as this Court has previously asserted herein, Jantran's contention that a bailment relationship was created with STC thereby relieving it of any responsibility as to the delivery of the barges entails factual disputes which preclude summary judgment on that issue.

## VII.  <u>Summary Judgment Motion of Oakley</u>

Oakley also seeks summary judgment, asserting first that Marquette is strictly liable for the cost of removal of the barges under the Rivers and Harbors Act, generally, and the Wreck Act, specifically.  As this Court has determined, relief under these statutes does not lie with any of the parties to this action other

35

than the United States as no private right of action is created by the enactments.[71]   The determination of liability, including that of Oakley as acknowledged in its MOA with the United States, is fraught with factual disputes which preclude summary judgment. Ultimately, Marquette's responsibility for payment of the damages to the United States may be adjudicated and realized under the River and Harbors Act, notwithstanding the determination that Marquette was not negligent in its actions set forth in these Findings and Recommendation.   But, that is not an issue for Oakley to prosecute.   Consequently, Oakley's next argument that Marquette cannot limit its liability under the Shipowner's Limitation of Liability Act is moot, considering that this is not an issue for Oakley's concern.

The final issue addressed by Oakley in its Motion concerns the amount that it has been damaged for which it asserts a claim against others.   Oakley seeks a determination that it incurred $3,956,249.11[72] in the repair of the dam and removal of the damaged barges based upon the affidavit of its expert.[73]   STC has been granted summary judgment on this claim.   Marquette questions the

---

71 *See* Part IV above.
72 Oakley reduces this figure to assert the undisputed portion is $3,802,843.73 in response to STC's contentions in its response.
73 Affidavit of Fred Budwine, Doc. Ent. No. 159, Exh. 1.

reasonableness of the damages allegedly sustained by Oakley from these repairs.[74]    The other remaining parties which are potentially subject to liability should be provided an opportunity to present evidence at trial as to the issue of the reasonableness of the expenses for which reimbursement is sought.    Oakley's protestations to the contrary, this is more appropriate fodder for trial, not summary judgment.

## VIII.    Summary Judgment Motion of CGB

CGB incorporates the summary judgment motion filed by Marquette – in particular with regard to Oakley's liability but not as it pertains to CGB's claim against Marquette.    Oakley filed the only response to this Motion, contending that it is inappropriate to simply incorporate Marquette's motion without asserting which facts it contends are not in dispute as required by Fed. R. Civ. P. 56(c).

Technically, Oakley is correct in its interpretation of the rule on summary judgment.    This Court does not favor such "me too" motions as it adds little to the analysis of the claims which the party whose motion is incorporated asserts.    This Court has ruled

---

74 Report of Kevin Highfield, Doc. Ent. No. 175, Exh. A.    This Court acknowledges that Mr. Highfield's opinion is the subject of a separate motion to exclude.

upon Marquette's summary judgment request on its own merits.  To the extent that ruling corresponds with CBG's position in this litigation, so be it.  To the extent it does or does not address all of the issues that CBG intended to assert, it will be required to file its own full-blown motion on its own accord.  On its face, CBG's Motion will be denied as it is asserted.

IT IS THEREFORE RECOMMENDED that:

1) Third-Party Defendant Jantran, Inc.'s Motion for Summary Judgment (Docket Entry No. 152) be **DENIED**;

2) Marquette Transportation Company, LLC and LMR Freight, LLC's Motion for Summary Judgment (Docket Entry No. 153) be **GRANTED**, in part, in that summary judgment be entered in Marquette's favor on the claims of negligence asserted against it by the other parties.  The remainder of the Motion should be **DENIED**;

3) Southern Towing Company, LLC's Motion to Strike Late Disclosed Expert (Docket Entry No. 154) be **DENIED**;

4) Consolidated Grain and Barge Co. and CGB Enterprises, Inc's Motion for Summary Judgment Against Bruce Oakley, Inc. and Johnston's Port 33 (Docket Entry No. 156) be **DENIED**;

5)   Petitioners-in-Limitation and Claimants Bruce Oakley, Inc.'s and Johnston's Port 33, Inc.'s Motion for Partial Summary Judgment (Docket Entry No. 159) be **DENIED;** and

6)   Southern Towing Company, LLC's Motion for Summary Judgment (Docket Entry No. 160) be **GRANTED,** in part, in that Oakley cannot recover the costs of voluntarily removing the barges and repairing the Webbers Falls Lock and Dam from STC. The remainder of the Motion should be **DENIED.**

The parties are given fourteen (14) days from the date of the service of these Findings and Recommendation to file any objections with the Clerk of the court.  Any such objection shall be limited to ten (10) pages in length.  Failure to object to these Findings and Recommendation within fourteen (14) days will preclude review of this decision by the District Court.

IT IS SO RECOMMENDED this 3rd day of March, 2025.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE